## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 18 2017, 9:33 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ruth Ann Johnson
Marion County Public Defender
Indianapolis, Indiana

Danielle L. Gregory
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

Ryan K. Gardner
Child Advocates, Inc.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Termination of the Parent-Child Relationship of:

K.C.C. and K.M.C. (Minor Children) and

V.P. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

October 18, 2017

Court of Appeals Case No. 49A02-1705-JT-979

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge

The Honorable Larry Bradley, Magistrate

Trial Court Cause No. 49D09-1606-JT-726 & 49D09-1606-JT-727



*Appellee-Petitioner.*

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, V.P. (Father), appeals the trial court's Order terminating his parental rights to his two minor children.

We affirm.

# ISSUE

Father raises one issue on appeal, which we restate as follows: Whether the Indiana Department of Child Services (DCS) presented clear and convincing evidence to support the termination of his parental rights.

# FACTS AND PROCEDURAL HISTORY

Father is the alleged biological father of K.C.C., born June 22, 2011, and K.M.C., born February 4, 2013 (collectively, the Children). B.C. (Mother) is

the biological mother of the Children.[1] It is unclear to what extent, if any, Father was involved in the first few years of K.C.C.'s life. The record indicates that Father had no relationship with K.M.C. following her birth.

[5] In February of 2013, the Marion County office of DCS became involved with the family after testing revealed that K.M.C. was born with controlled substances in her system. At the time, Father's whereabouts were unknown. The Children were removed from Mother's care, placed in foster care, and adjudicated as Children in Need of Services (CHINS). Over the next year, Mother completed substance abuse treatment and provided negative drug screens, while the record indicates that Father never appeared before the court and remained entirely uninvolved in the DCS case and the Children's lives. In July of 2014, the case was closed and the Children were returned home to Mother.

[6] Within eight months of having the Children returned to her care, Mother had resumed her struggle with substance abuse—specifically, an addiction to methamphetamine and heroin. At the time, Mother and the Children were living with Mother's parents in Indianapolis, Marion County, Indiana, and it was reported that Mother's ability to maintain sobriety was hindered by the fact that her mother was addicted to opiates and her father was an alcoholic. DCS again became involved and, as before, Father was not available to care for the

---

[1] Mother's parental rights to the Children were terminated on April 17, 2017. Mother does not participate in this appeal.

Children. Thus, DCS removed the Children and placed them with the same foster parents who had cared for them in the prior CHINS case. The Children have done "amazing" in their placement, and the foster parents intend to adopt them. (Tr. Vol. II, p. 50).

[7] On March 5, 2015, DCS filed a petition alleging the Children to be CHINS. DCS asserted that the Children's "physical or mental condition[s] [are] seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the [Children's] [parents] . . . to supply the [Children] with necessary food, clothing, shelter, medical care, education, or supervision." (DCS Exh. 22). After receiving DCS' petition, the trial court appointed a guardian *ad litem* to represent the interests of the Children.

[8] The next day, the trial court conducted an initial and detention hearing. Father did not appear. Although the trial court approved the Children's detainment as being necessary for their protection, the trial continued the initial hearing until March 24, 2015. At that time, Father appeared and requested to be appointed counsel. Father reported that he was unemployed and living with a friend. Father also denied being the Children's biological parent and gave no indication that he wanted the Children in his care. Nevertheless, he spoke with DCS and agreed that he would participate in reunification services. The trial court ordered a DNA test, but Father never completed the testing to establish his paternity.

[9] On June 16, 2015, the trial court conducted a fact-finding hearing on DCS' CHINS petition. Father did not appear, and his attorney indicated that she had been unable to contact him. Nevertheless, Mother admitted to the allegations contained in the CHINS petition, and the trial court adjudicated the Children to be CHINS. On July 14, 2015, the trial court held a dispositional hearing (at which Father did not appear) and issued a dispositional order. The trial court granted wardship of the Children to DCS and directed the parents to comply with case plans in order to reunite with the Children. The trial court simultaneously issued a Parental Participation Order, specifically requiring Father and Mother to participate in services as recommended by DCS. As to Father, the trial court ordered that he engage in a home-based therapy program and home-based case management program as referred by DCS.

[10] For the ten months following his appearance at the March 24, 2015 continued initial hearing, Father's whereabouts were unknown. He made no effort to communicate with DCS or otherwise engage in his court-ordered case plan, and DCS' attempts to contact him were unsuccessful. Similarly, Father's attorney withdrew based on Father's refusal to communicate. On January 5, 2016, Father appeared in court for the first time since his initial hearing, and the trial court appointed new representation. DCS subsequently referred Father for home-based case management and arranged for Father to have supervised visits with the Children.

[11] Father maintained full-time employment. However, at some point, he moved into the home shared by Mother and her parents. Given the ongoing substance

abuse in Mother's family home, Father was informed that he needed to obtain suitable independent housing. Father's home-based case manager offered to help Father search for housing and with the application process and also provided information on available apartments. Although Father indicated that he would search on his own or contact his service provider to arrange a time when they could look together, Father never did so. He stated that he was considering moving in with his father, but Father "never . . . made any movement on it." (Tr. Vol. II, p. 138).

[12] Father participated in visitation with the Children once per week. The Children were initially "reluctant to engage with" Father during the visits, but as visits progressed, "[i]t got a little better." (Tr. Vol. II, pp. 140, 142). Despite instructions from his visitation supervisor to prepare for the visits, Father consistently indicated that he did not "know what to do," so it was left to the supervisor to select meeting places as Father did not have appropriate housing where visits could occur. (Tr. Vol. II, p. 143). Although Father "tried . . . to engage with the [Children]," he sometimes struggled with paying attention to both of them. (Tr. Vol. II, p. 147). The visitation supervisor expressed concerns about Father's parenting skills to the extent that he did not demonstrate a willingness to "advocate for [the Children]." (Tr. Vol. II, p. 152). Furthermore, Father cancelled or failed to show up for at least five visits. The service provider's policy was to terminate services following three missed visits; thus, Father's visitation with the Children was terminated in the summer of 2016. Thereafter, he ceased communicating with DCS.

On June 16, 2016, DCS filed a petition to terminate the parental rights of Father and Mother. On March 2, 2017, and March 27, 2017, the trial court conducted a hearing on DCS' termination petition. During the hearing, DCS and the Children's guardian *ad litem* advocated for the termination of the parents' rights to the Children. In turn, the parents sought additional time to be able to participate in reunification services and establish their fitness to care for the Children. On April 17, 2017, the trial court issued its Order, terminating the parental rights of Father and Mother. The trial court determined, in relevant part, that there is a reasonable probability that the conditions resulting in the removal and continued placement of the Children outside the home will not be remedied, that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the Children's well-being, and that termination of the parent-child relationship is in the best interests of the Children.

Father now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

Father appeals the trial court's termination of his parental rights. "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). In fact, the Fourteenth Amendment to the United States Constitution protects "the

traditional right of parents to establish a home and raise their children." *Id.*
Yet, "parental rights are not absolute and must be subordinated to the child's
interests when determining the proper disposition of a petition to terminate
parental rights." *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1122 (Ind.
Ct. App. 2013) (internal quotation marks omitted) (quoting *In re I.A.*, 934
N.E.2d 1127, 1132 (Ind. 2010)). Our courts have determined that termination
of parental rights is appropriate if "parents are unable or unwilling to meet their
parental responsibilities." *In re G.Y.*, 904 N.E.2d at 1259-60. We recognize that
the termination of a parent-child relationship is "an extreme measure and
should only be utilized as a last resort when all other reasonable efforts to
protect the integrity of the natural relationship between parent and child have
failed." *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015)
(internal quotation marks omitted).

[16] When reviewing a trial court's termination order, our court does not reweigh
evidence or assess witness credibility. *In re G.Y.*, 904 N.E.2d at 1260. We
"consider only the evidence and reasonable inferences that are most favorable
to the judgment." *Id.* Also, the trial court issued specific findings of fact and
conclusions thereon, which requires application of the two-tiered standard of
review set forth in Indiana Trial Rule 52(A): "[f]irst, we determine whether the
evidence supports the findings, and second we determine whether the findings
support the judgment." *Id.* We "shall not set aside the findings or judgment
unless clearly erroneous, and due regard shall be given to the opportunity of the
trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). A

trial court has clearly erred "if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re G.Y.*, 904 N.E.2d at 1260 (quoting *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005)).

## II. *Termination of Parental Rights*

To support the termination of a parent's rights, DCS must prove, in relevant part, that a child has been removed from the home for a certain period, and

> (B) that one (1) of the following is true:
>     (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>     (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>     (iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS].
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS is required to establish each element by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d at 1260.

On appeal, Father concedes that the Children have been removed from the parents' care for the requisite time and that DCS has established a satisfactory plan for the Children's care and treatment. Thus, he challenges the trial court's conclusions regarding the existence of a reasonable probability either that the conditions resulting in the Children's removal and continued placement outside

the home will not be remedied or that the continuation of the parent-child relationship poses a threat to the Children's well-being[2] and that termination is in the Children's best interests. We address each argument in turn.

## A. *Remediation of Conditions*

[19] Father claims that there is insufficient evidence to support the trial court's conclusion that there is a reasonable probability that the conditions resulting in the Children's removal and continued placement outside the home will not be remedied. In determining whether there is a reasonable probability that conditions will not be remedied, we must identify what conditions led to the Children's "placement and retention" outside of the home and subsequently determine whether there is a reasonable probability that those conditions will not be remedied. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need only establish that there is a reasonable probability that the parent's behavior will not change." *A.D.S. v. Ind. Dep't of Child Servs.*,

---

[2] Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive; thus, DCS need only prove one of the three elements listed. *See In re A.K.*, 924 N.E.2d 212, 220-21 (Ind. Ct. App. 2010), *trans. dismissed*. In this case, DCS alleged, and the evidence supports, that the Children have now twice been adjudicated CHINS. While this alone would satisfy DCS' burden under Indiana Code section 31-35-2-4(b)(2)(B), we recognize that the trial court did not rely on Indiana Code section 31-35-2-4(b)(2)(B)(iii) in ordering the termination of Father's rights. Instead, the trial court analyzed whether DCS established the existence of a reasonable probability either that the conditions resulting in the Children's removal or continued placement outside the home will not be remedied or that the continuation of the parent-child relationship poses a threat to the Children's well-being. Thus, we will review the same.

987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013) (internal quotation marks omitted), *trans. denied*.

[20] "[T]he trial court should judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration evidence of changed conditions." *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The trial court must further "balanc[e] a parent's recent improvements against 'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (second alteration in original) (quoting *K.T.K.*, 989 N.E.2d at 1231). "Habitual conduct may include 'criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.'" *K.E.*, 39 N.E.3d at 647. The trial court is vested with "discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *In re E.M.*, 4 N.E.3d at 643. Although a trial court must "give due regard to changed conditions," it is "not preclude[d] . . . from finding that parents' past behavior is the best predictor of their future behavior." *Id.*

[21] Here, the Children were removed from the home due to Mother's substance abuse in conjunction with the fact that Father was unavailable to care for them. Thereafter, the Children remained in foster care due to Mother's inability to achieve sobriety and Father's inability to provide the Children with a safe and stable living environment, along with Father's lack of consistent participation in this case. The trial court found that Father "has demonstrated he is not willing

to be a full time parent by failing to follow through to obtain appropriate housing, to consistently visit the [C]hildren, or even take the first step of establishing paternity." (Appellant's App. Vol. II, p. 34). Despite his gainful employment, Father "made no progress in obtaining an appropriate home and remains living with the [C]hildren's [M]other and her parents." (Appellant's App. Vol. II, p. 34). In addition, Father engaged in once-per-week visitation with the Children for a few months in 2016 before his services were terminated "due to [Father] exceeding his allotment of cancellation of, or no-showing at, visits." (Appellant's App. Vol. II, p. 34).

[22] According to Father, DCS "failed to provide the services to assist Father with his housing situation and then failed to make sure the appropriate services were being offered to assist Father with his housing situation." (Appellant's Br. p. 18).

> Father did not have the ability to obtain housing on his own. The provider responsible for assisting Father with his housing was also responsible for supervising his visitation; however, she made no efforts to assist Father with his housing beyond asking him how his search was progressing while she supervised his visits. Father wasn't even aware the provider was supposed to assist him with his search. Father was open to finding new housing. There was no evidence that Father refused any assistance offered by his providers; however, by the time of the termination trial, Father was still living with Mother.

(Appellant's Br. p. 18). Father points out that he maintained employment throughout the case and never tested positive for drugs. Thus, he insists that if

DCS had "provided the appropriate assistance, the reasons for the [C]hildren's removal would have been remedied." (Appellant's Br. p. 18).

[23] It is well established that "the law concerning termination of parental rights does not require [DCS] to offer services to the parent to correct the deficiencies in childcare." *In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000). "Rather, while a participation plan serves as a useful tool in assisting parents in meeting their obligations, and while county departments of public welfare routinely offer services to assist parents in regaining custody of their children, termination of parental rights may occur independently of them, as long as the elements of [Indiana Code section 31-35-2-4] are proven by clear and convincing evidence." *Id.* "[A] parent may not sit idly by without asserting a need or desire for services and then successfully argue that he was denied services to assist him with his parenting." *Id.*

[24] The evidence clearly establishes that Father failed to remedy the conditions resulting in the Children's removal and continued placement outside the home, despite ample time and opportunity to do so. Moreover, the blame for Father's inability to provide the Children with a safe and stable home rests squarely on his own shoulders. Father's nonchalant attitude toward reunification was evident throughout the case. Following the Children's removal, he appeared at one hearing and then—for nearly a year—failed to attend any court proceedings, made no effort to see the Children, avoided all communication attempts by DCS and made no contact of his own, did nothing to participate in his court-ordered services, and declined to communicate with his attorney. *See*

*A.F.*, 762 N.E.2d at 1252 (noting that a parent's failure to appear for services and court hearings "reflects ambivalence" and "an unwillingness to change existing conditions"). When Father eventually appeared and indicated that he would participate in the case, mere months before DCS filed its termination petition, he declined to take even the minimum steps necessary for reunification: he never followed through with establishing paternity, he missed an unacceptable number of visits with the Children, and he failed to find appropriate housing.

[25] There is nothing in the record that would support Father's argument that he was unable to obtain housing on his own. The supervisor of his home-based service provider did indicate that Father "didn't have any ability [to look for something else] right then," but offered no further explanation. (Tr. Vol. II, p. 119). In fact, the evidence establishes that Father was gainfully employed on a full-time basis, and the home-based case manager who worked directly with Father noted nothing that would have prevented him from searching for housing. She testified that Father understood the requirement that he obtain housing separate from Mother in order to reunify with the Children, and he informed her "that he was looking" and "at one point that he was thinking about moving [in] with his dad." (Tr. Vol. II, p. 138). Furthermore, Father's argument completely ignores the testimony of his home-based case manager that she offered to assist Father with searching and applying for housing and that she provided suggestions on specific locations to consider, but Father never availed himself of her services. It was within the discretion of the trial court to

credit the testimony of the home-based case manager over Father's claims that he received no assistance in his housing search. *See In re E.M.*, 4 N.E.3d at 642 (noting that "weighing the evidence . . . is the trial court's prerogative").

[26] The fact that Father refused to expend even a nominal amount of effort to search for appropriate housing is highly indicative of his lack of desire to provide for the needs of two young Children. Father appears to believe that it was DCS' responsibility to take him by the hand in ensuring compliance with his case plan, but DCS and the service providers cannot be expected to force parental engagement. It is the *parent's* obligation to ensure that his or her child's needs are met, and in this case, Father demonstrated his unwillingness to do so. Accordingly, we find that DCS presented ample evidence to support the trial court's determination that there is a reasonable probability that the conditions resulting in the Children's removal and continued placement out of the home will not be remedied.[3]

### B. *Best Interests of the Children*

[27] Father also claims that the trial court's conclusion that termination is in the best interests of the Children is unsupported by the evidence. The purpose of terminating a parent-child relationship is to protect the child, not to punish the parent. *In re C.C.*, 788 N.E.2d 847, 855 (Ind. Ct. App. 2003), *trans. denied*.

---

[3] As there is sufficient evidence of a reasonable probability that conditions will not be remedied, we need not address the alternative element of Indiana Code section 31-35-2-4(b)(2)(B) regarding whether the continuation of the parent-child relationship poses a threat to the Child's well-being. *See In re A.K.*, 924 N.E.2d at 220-21.

While "[c]lear and convincing evidence need not reveal that the continued custody of the parent . . . is wholly inadequate for the child's very survival[,] . . . it is sufficient to show . . . that the child's emotional and physical development are threatened by the respondent parent's custody." *K.T.K.*, 989 N.E.2d at 1234-35 (first and fourth alterations in original) (quoting *Bester*, 839 N.E.2d at 148). For this element, the trial court must "look beyond the factors identified by [DCS] and . . . look to the totality of the evidence." *A.D.S.*, 987 N.E.2d at 1158. "The trial court need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship." *K.T.K.*, 989 N.E.2d at 1235. It is well settled that "[p]ermanency is a central consideration in determining the [child's] best interests." *Id.* (alterations in original) (quoting *In re G.Y.*, 904 N.E.2d at 1265).

[28] The trial court found that termination is in the Children's best interests because the Children could then "be adopted into a stable and permanent home where their needs will be safely met." (Appellant's App. Vol. II, p. 34). "The [C]hildren have been observed to be highly bonded with their caregivers, and as having an organic relationship with them." (Appellant's App. Vol. II, p. 34). Father, however, argues that

> he has demonstrated a willingness to provide [permanency in a stable environment]. Had he been provided the assistance to obtain housing, he would have shown his ability to provide the permanent and the stable environment the [C]hildren require. There was no evidence Father's behavior or his residence was inappropriate, but for Mother and her mother residing in the

home. There was no evidence Father had a criminal history which threatened the well-being of the [C]hildren.[4] Father['s] blood relationship with the [C]hildren, his desire and willingness to parent them, give him a superior right that should not be revoked.

(Appellant's Br. pp. 19-20).

[29] The record in this case demonstrates that Father has never acted in the best interests of the Children. From the time the Children were born, it appears that Father had little-to-no involvement in their lives. Throughout the entirety of the first CHINS case, Father's whereabouts were unknown, and he was absent for a large portion of the instant case. Father never established his paternity, and during the handful of times that he visited the Children, he was unprepared and unable to see to the needs of both K.C.C. and K.M.C. Most significantly, even though he was employed, Father failed to prioritize the Children's need for a safe and stable home by continuing to reside in Mother's home with ongoing substance abuse.

[30] Moreover, it is well established that "the recommendation by both the [DCS] case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the

---

[4] Father's argument should not be construed as indicating that he does not have a criminal record. The State presented evidence that Father was convicted of patronizing a prostitute, a Class A misdemeanor, in 2014. Regardless, the trial court did not rely on Father's criminal record in terminating his parental rights.

child's best interests." *A.D.S.*, 987 N.E.2d at 1158. Here, DCS testified that termination was in the Children's best interests because "[t]he [C]hildren are in a home where they're comfortable with parents who they have grown a strong attachment to and plus the living arrangements for both parents are not a good living arrangement[] for the [C]hildren to be returned home to." (Tr. Vol. II, pp. 48-49). The Children's guardian *ad litem* agreed, stating that the Children "are doing exceptionally well" in their foster home, and "the parents have had ample time. There have been multiple different opportunities for the services to take hold." (Tr. Vol. II, p. 186). Therefore, we find that DCS presented sufficient evidence to support the trial court's conclusion that termination of Father's parental rights is in the Children's best interests.

## CONCLUSION

Based on the foregoing, we conclude that DCS presented clear and convincing evidence to support the trial court's termination of Father's parental rights.

Affirmed.

Robb, J. and Pyle, J. concur